UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY NEEDHAM,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NANCY BERRYHILL,<br><br>　　　　　Defendant. | Case No.　18-cv-04183-PJH<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 19 |

Plaintiff Timothy Needham seeks judicial review of the Commissioner of Social Security's (the "Commissioner") final decision denying Needham's claim for disability benefits pursuant to 42 U.S.C. § 405(g). This action is before the court on the parties' cross-motions for summary judgment. Having considered the parties' cross-motions, the pertinent legal authorities, and having reviewed the administrative record, the court hereby remands this case to the Commissioner for further proceedings in accordance with this court's order.

**BACKGROUND**

**A.　Personal History**

In October 2013, Needham applied for Supplemental Security Income, alleging disability beginning in September 2006. Administrative Record ("A.R.") 61. Needham attended school through the tenth grade, obtained his GED, and attended community college for a semester or two. A.R. 39, 539, 770, 913. Needham worked as a truck driver from at least 1996 (perhaps earlier) to about 2001, when he was attacked on the job and experienced trauma-related anxiety. A.R. 243–44, 258, 270, 289, 389, 519.

Around 2006, he divorced his wife, and in 2012 he became homeless.  A.R. 240, 389, 520, 769–70, 913.  He has used methamphetamine off and on throughout his life.  A.R. 519.

On September 7, 2013, Needham attempted to commit suicide.  A.R. 518.  After being injured in an altercation and admitted into Eden Medical Center's emergency room, he entered a bathroom, slit his wrists, took a mixture of pills, wrote a suicide note on the mirror, and hit the call button.  A.R. 408, 417, 420, 518, 543, 788, 808.  Medical staff gave him medication and transferred him to John George Psychiatric Pavilion at the Highland Campus, where he was diagnosed with depressive disorder not otherwise specified ("NOS") and alcohol abuse and assigned a Global Assessment Functioning ("GAF")[1] score of 20.  A.R. 443–45, 810.  While at John George Psychiatric Pavilion, Dr. John Fenton, M.D. evaluated Needham and diagnosed him with major depressive disorder, alcohol abuse, and history of amphetamine abuse.  A.R. 542.  Dr. Fenton reported improvement in Needham's mood and that medication doses had been adjusted to "therapeutic effect."  A.R. 544.

Needham was thereafter admitted to Woodroe Place Crisis Resolution, a residential mental health facility operated by Bay Area Community Services ("BACS").  A.R. 541, see also A.R. 904.  At Woodroe Place, Dr. Edward Maxwell observed that Needham was restless with a dysphoric, expansive mood and mildly impaired judgment.  A.R. 905–06.  Needham continued to receive therapy from mental health counselors and was assessed  GAF scores ranging from 45 to 55.  A.R. 893, 907.

On October 9, 2013, Needham was discharged from Woodroe Place and moved

---

[1] A GAF score is a measurement of overall functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 27–34 (4th TR. ed. 2000).  A score of 11–20 indicates "[s]ome danger of hurting self or others"; 21–30 indicates "inability to function in almost all areas"; 31–40 indicates "major impairment in several areas, such as work or school"; 41–50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupation, or school functioning"; 51–60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupation, or school functioning"; 61–70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupation, or school functioning . . . but generally functioning pretty well[.]"  Id. at 34.

to the A Street shelter.  A.R. 893.  On October 10, 2013, Needham began participating in mental health treatment and case management with BACS Oakland Project Connect.  A.R. 1074.  He continued almost weekly contact with therapists and case managers until July 28, 2016.  E.g., A.R. 922.

Between October 2013 and December 2013, Needham was also treated at the Sausal Creek Outpatient Stabilization Clinic, a drop-in mental health clinic.  A.R. 485–505.  On October 28, 2013, Dr. Emma Castro observed that he was alert and had anxious mood, irritable affect, logical thought process, and marginal judgment.  A.R. 495.  She also saw him on November 8, November 22, 2013, and December 6, 2013, diagnosing him with psychotic disorder NOS, bipolar disorder, and polysubstance dependence in partial remission, and assigning GAF scores of 50, 52, and 55.  A.R. 486, 490, 495.  By the last visit, "the meds seem[ed] to be working good" and Needham's insight and judgment were good.  A.R. 486.

In December 2013, Needham had several evaluations at the Winton Wellness Center.[2]  On December 4, 2013, he saw Dr. Srilekha Puranam for his hypertension and bipolar disorder.  A.R. 763, 768.  He reported aggravation of the bipolar disorder by drug use as well as decreased sleep, depressed mood, and racing thoughts, but no suicidal ideation.  A.R. 763.  On December 13, 2013, Needham had an initial psychiatric evaluation with Dr. Catalina Villa.  A.R. 769–72.  He reported symptoms of severe depression at least one week per month, including crying, staying in bed, and decreased appetite.  A.R. 769.  Dr. Villa noted that despite a "constricted" affect, Needham showed "unremarkable" behavior, good impulse control, and no suicidal or homicidal ideation.  A.R. 771.  She diagnosed him with unspecified bipolar disorder, alcohol dependence in early remission, and amphetamine dependence in full remission.  Id.

On January 29, 2014, Needham returned to Sausal Creek with increased symptoms, reporting he was "up/down with depression" for three weeks and that his

---

[2] Winston Wellness Center later became the Hayward Wellness Center.  A.R. 1084.

medications were not helping. A.R. 734. On February 24, 2014, he returned again to Sausal Creek requesting medication for depression. A.R. 729. The staff psychiatrist noted his euthymic affect and depressed mood and diagnosed him with psychotic disorder NOS, bipolar disorder, and polysubstance abuse with a GAF score of 55. A.R. 730. He prescribed him the same dosage of Remeron, Risperdone, Depakote, and Benadryl, and added Buproprin. A.R. 728.

On February 14, 2014, psychologist Dr. Deepa Abraham examined Needham and conducted a records review. A.R. 516. She noted he had "somewhat pressured" speech, intact concentration, and average results on the Wechsler Adult Intelligence Scales. A.R. 521–23. She reported that Needham exhibited symptoms of depression such as lethargy, insomnia, and social withdrawal and a manic presentation including grandiosity, racing thoughts, and reckless behavior. A.R. 526. She diagnosed him with mood disorder NOS and polysubstance dependence while assigning him a GAF score of 35. A.R. 527. Because of his symptoms, she opined that he would "experience difficulty competing for jobs in an open labor market" and "difficulty coping with daily or the usual stresses encountered in a competitive work environment." A.R. 528–29. She also noted his low auditory memory scores that "might reflect in difficulty with remembering work assignments, processing complex instructions or in completing tasks." A.R. 528. She concluded that he had mild impairments in understanding, comprehending, and remembering information; no significant impairment in social interaction; and moderate impairment in adaptation. A.R. 528–29.

On April 1, 2014, Dr. Puranam reported Needham's bipolar disorder and insomnia were "[w]ell controlled" and noted he had not used alcohol in two months and amphetamines in four months. A.R. 756. Around this time, Needham moved to transitional housing. A.R. 1056–58.

Throughout 2014, Needham continued services at BACS Oakland Project Connect. He met with MacKenzie Stuart, a BACS unlicensed marriage and family therapist and Tiffany Smith, a BACS personal services coordinator, on a weekly basis for

4

therapy and help with tasks and appointments.  A.R. 1031–63.  Ms. Stuart diagnosed

Needham with a consistent GAF score of 45.  A.R. 1031–63.  His symptoms included

"overwhelming sadness" (A.R. 1039), suicidal ideation (A.R. 1045–46), anhedonia

(A.R. 1039–44, 1047), hypersomnia (A.R. 1039, 1050), and fear of leaving the house

(A.R. 1054).  He also presented with pressured speech, racing thoughts, and anxiety.

A.R. 1033, 1037, 1049.  Other times, he presented as euthymic (A.R. 1050–53) and

reported having "significantly better" mood (A.R. 1037) and no recent manic or severe

depressive episodes (A.R. 1053).

On December 15, 2014, Needham had an intake appointment with psychiatrist Dr.

Catherine Reed at Pathways to Wellness ("Pathways"), a mental health clinic.  A.R. 531,

536.  Needham reported mood swings, insomnia, and nighttime auditory hallucinations

that affected his activities of daily living.  A.R. 531, 535–36.  Dr. Reed diagnosed him with

bipolar disorder, depression, with psychotic features, and amphetamine dependence in

remission with a GAF score of 65.  A.R. 535.  She noted he had normal behavior, normal

speech, depressed mood but was "hopeful," and appropriate affect.  A.R. 534.  She

added Latuda to his medications (A.R. 537) and opined that he had moderate restrictions

in activities of daily living; moderate difficulties in social functioning; mild difficulties in

maintaining, concentrating, and persistence of pace; and moderate episodes of

decomposition and increase of symptoms (A.R. 535).

Needham continued treatment at Pathways throughout 2015.  On March 19, 2015,

Needham reported improvement with medications and mild sadness.  A.R. 889.

Dr. Reed assessed a GAF score of 60–65.  A.R. 888.  On April 8, 2015, Needham told

Dr. Puranam that he felt better as his medication changed from Risperdone to Latuda.

A.R. 846.  On July 9, 2015, Dr. Reed upgraded his GAF score to 65 after noting a good

response to medications, his attendance in DUI classes, and lack of psychosis or mania.

A.R. 884–85.  On August 26, 2015, Needham reported feeling very sad after a friend's

death and had not taken medication for two weeks.  A.R. 882–83.  On September 28,

2015, Needham reported fewer auditory hallucinations and better sleep after increased

1   dosage of Latuda.  A.R. 880–81.  Starting in August 2015, Dr. Reed reduced Needham's

2   Wellbutrin dosage because of his increased blood pressure, and on December 16, 2015

3   Nurse Practitioner Sarah Levine noted that Needham's depression was exacerbated by

4   the holiday season.  A.R. 876–77.

5   Throughout 2015 and 2016, Needham continued to work with BACS for housing,

6   employment, and symptom management.  A.R. 990, 922.  Shandra Guzman diagnosed

7   him with major depressive disorder (severe without psychotic features), alcohol

8   dependence, and amphetamine dependence (sustained remission) with a GAF score of

9   45.  A.R. 990.  On March 25, 2015, Ms. Stuart "supported" Needham to an internal

10  medicine consultation and observed that he was anxious about attending the

11  appointment.  A.R. 1019.  Needham reported needing help to complete tasks and periods

12  of increased depression.  A.R. 953–55, 986, 1008–11, 1025.

13  In January 2016, Needham moved to permanent supportive housing, and he

14  continued treatment at Pathways until November 2016.  A.R. 939, 1078.  On February

15  24, 2016, Needham reported anxiety over the recent move and increased auditory

16  hallucinations.  A.R. 875.  On March 23, 2016, he reported improvement in mood since

17  increasing his Latuda dosage.  A.R. 872.  On April 27, 2016, Needham reported he was

18  doing fairly well but still spent most of the day in bed about once a week; Nurse Levine

19  assigned a GAF score of 60.  A.R. 870.  As of June 23, 2016, a Pathways psychiatrist

20  reported that Needham was stable on medications "after so many trials."  A.R. 869.  On

21  September 29, 2016, Needham said he was "doing well with his med[ication]s" and

22  presented with normal speech and euthymic mood.  A.R. 1077.

23  In April 2017, Needham began therapy, social groups, and case management at

24  Lifelong Medical Care.  A.R. 1082.  On April 27, 2017, Needham felt stable on his

25  medications and denied suicidal ideation.  On April 28, 2017, therapist Ann Sussman

26  observed Needham had rapid speech, tangential thought processes with grandiose

27  content, and that he "mostly blame[d] others for [his] problems."  A.R. 1093.  On May 5,

28  2017, Needham said he was "doing pretty well" and admitted to "drinking and smoking

United States District Court
Northern District of California

pot on occasion[.]" A.R. 1096–97.

**B.    Procedural History**

On October 25, 2013, Needham filed a Title II application for a period of disability and disability insurance benefits as well as a Title XVI application for supplemental security income. A.R. 15, 61, 85–86. Both applications stated an alleged onset date of September 29, 2006 for disability. A.R. 61. The Commissioner denied Needham's claims both initially and again upon reconsideration on September 17, 2014 and June 3, 2015, respectively. A.R. 84, 116. On July 13, 2015, Needham requested a hearing before an ALJ which took place on May 19, 2017. A.R. 145, 196. At the hearing, plaintiff amended his disability onset date to September 7, 2013. A.R. 15, 59, 390. Vocational expert Christopher Salvo testified at the proceeding. A.R. 54–59. Needham also testified and answered questions from the ALJ and his counsel. A.R. 38–54.

In May 2017, the ALJ found that plaintiff was not disabled. The ALJ's May 2017 decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. A.R. 1–7.

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act provides for the payment of disability insurance benefits to people who have contributed to the social security system and who suffer from a physical or mental disability. See 42 U.S.C. § 423(a)(1). To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ is required to use a five-step sequential analysis. See 20 C.F.R. § 416.920(a). The ALJ may terminate the analysis at any step if he determines that the claimant is or is not disabled. Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines whether the claimant is engaging in any "substantial gainful activity," which would automatically preclude the claimant receiving disability benefits. 20 C.F.R. §§ 416.920(a)(4)(i) & (b). If not, at step two, the ALJ considers whether the claimant suffers from a severe impairment which "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R.

§§ 416.920(a)(4)(ii) & (c).

At the third step, the ALJ is required to compare the claimant's impairment(s) to a listing of impairments provided in an appendix to the regulations. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the listing, the claimant is presumed disabled and should be awarded benefits. Id.; 20 C.F.R. § 416.920(d).

If the claimant's condition does not meet or equal a listing, at step four the ALJ considers whether the claimant has sufficient residual functional capacity ("RFC") to perform his past work despite the limitations caused by the impairments. 20 C.F.R. §§ 416.920(a)(4)(iv) & (e)–(f). An individual's RFC is what he can still do in a workplace setting despite his physical and mental limitations. 20 C.F.R. § 416.945. In determining the RFC, the ALJ must consider all of the claimant's impairments, including those that are not severe, taking into account all relevant medical and other evidence. 20 C.F.R. §§ 416.920(e), 416.945. If the claimant cannot perform his past work, the Commissioner is required to determine, at step five, whether the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. See 20 C.F.R. §§ 416.920(a)(4)(v) & (g).

In steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation. Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995). If the analysis proceeds at step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work. Id.

**ALJ'S FINDINGS**

On May 31, 2017, the ALJ applied the sequential analysis and found that Needham was not disabled, concluding that he could perform jobs within the national economy. A.R. 12–27.

**A.      The ALJ's Sequential Analysis**

At step one, the ALJ determined Needham had not engaged in "substantial gainful

activity" since his amended onset date of September 7, 2013. A.R. 17.[3]

At step two, the ALJ found Needham suffered from severe impairments of bipolar disorder, amphetamine dependence, alcohol dependence, and obesity. A.R. 18. The ALJ also found that Needham's hypertension and sarcoidosis were non-severe impairments and that Needham did not provide evidence that these impairments would result in a significant limitation in basic work-related activities. A.R. 18–19.

At step three, the ALJ concluded that the impairments failed to meet the criteria or severity of any section of the listing of impairments in 20 CFR Part 404, subpart P, Appendix 1. A.R. 19–23. In making that finding, the ALJ considered whether the "paragraph B" criteria were satisfied. The ALJ found that disability could not be established under paragraph B in light of the medical facts. A.R. 19–23. The mental health records "reveal one major crisis but are inconsistent with disability." A.R. 19. The ALJ reviewed medical records, evaluated the persuasiveness of various sources in the record, and concluded that plaintiff's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, so paragraph B criteria were not satisfied. A.R. 23. The ALJ also briefly addressed paragraph C and determined plaintiff did not satisfy its requirements. A.R. 23.

Having found that Needham did not suffer from a listed impairment, the ALJ determined Needham's RFC. The ALJ applied a two-step process that considered all symptoms regardless of severity. A.R. 23. First, the ALJ determined whether there was an underlying medically-determinable physical or mental impairment that could reasonably be expected to produce Needham's pain or other symptoms. A.R. 23. The ALJ concluded that Needham's medically-determinable impairments could reasonably be expected to cause the alleged symptoms. A.R. 24. Second, the ALJ evaluated the intensity, persistence, and limiting effects of Needham's symptoms to determine the

---

[3] The ALJ referred to the amended onset date as January 7, 2013 at finding of fact 1 and as September 7, 2013 at finding of fact 2. See A.R. 17; see also A.R. 59. The correct date is September 7, 2013, and the ALJ's error here is harmless.

United States District Court
Northern District of California

extent to which they limited his functioning. A.R. 23. The ALJ concluded that Needham's testimony about the intensity, persistence and limiting effects of the symptoms was not entirely consistent with medical evidence and other evidence in the record. A.R. 24. Where Needham reported symptoms that did not match the objective medical evidence, the ALJ made a credibility determination based on the entire medical record:

> Claimant alleges he quit working as a truck driver in 2004 because of his conditions. . . However, he has submitted no evidence from that time, and the current medical evidence of record shows claimant . . . lost his license/job after crashing into a pole and received a DUI. Claimant testified he is unable to work due to his depression . . . [and] hears voices, which prevents him from concentrating. On April 27, 2016, claimant reported he is not bothered by his auditory hallucinations . . . He reported "doing well with his meds," and was assigned a GAF score of 60 . . . . Recent records from Lifelong Medical indicate claimant remains stable on medications.

AT 24 (internal quotation marks and citations omitted). The ALJ determined that plaintiff has the RFC to perform light work, with certain exceptions. A.R. 23.

At step four of the sequential analysis, the ALJ determined that Needham had no past relevant work. A.R. 25.

At step five, based on the vocational expert's testimony, the ALJ determined that jobs existed in significant numbers in the national economy that Needham could perform. A.R. 25–26. Specifically, Needham's RFC did not prevent him from working as a "small products assembler", "production assembler", or "maid" as described in the Dictionary of Occupational Titles. A.R. 26. The ALJ therefore determined that Needham was not disabled and not eligible for disability benefits under the Social Security Act. A.R. 26.

## B. The ALJ's Weighing of the Medical Opinions and Testimony

The ALJ considered and weighed the testimony and opinions of several medical professionals. The primary medical opinions were authored by:

### 1. Dr. Deepa Abraham

Dr. Abraham administered a psychological evaluation of Needham on February 14, 2014. A.R. 516. She opined that he would have "difficulty coping with [the] daily or [] usual stresses encountered in a competitive work environment" and that he has "mood

changes that interfere with his ability to sustain effort or adapt to changes in tasks or responsibilities." A.R. 529. She concluded he had mild impairments in understanding information, no significant impairment in social interaction, and moderate impairment in adaptation. A.R. 528–29.

Dr. Abraham was an examining psychologist, and the ALJ gave her opinion "great weight" because her opinions were "consistent with the medical evidence…and based upon a thorough examination and records review." A.R. 22.

### 2. Dr. Catherine Reed

Dr. Reed conducted an initial psychological intake of Needham on December 15, 2014 (A.R. 536) and treated him from February 11, 2015 to October 26, 2015 (A.R. 879, 891). At intake, she assessed that he had moderate restrictions in activities of daily living; moderate difficulties in social functioning; mild difficulties in maintaining, concentrating, and persistence of pace; and moderate episodes of decomposition and increase of symptoms. A.R. 535.

Dr. Reed was a treating psychiatrist, and the ALJ gave her opinion "great weight" because it was "consistent with the medical evidence of record." A.R. 22.

### 3. Dr. Margaret Pollack

On July 30, 2014, Dr. Pollack, Psy.D. conducted a psychological consultative review of the medical records that guided the Social Security Administration's determination of "Not Disabled." A.R. 69, 72. Dr. Pollack noted that in Dr. Abraham's evaluation, Needham alleged auditory hallucinations, but "there was no evidence that he was responding to internal stimuli and no other evidence of psychosis." A.R. 69. Dr. Pollack opined that his depression and bipolar disorder were negatively impacted by lack of reasonable compliance and "significant" substance abuse problems. A.R. 69. She believed that with sustained sobriety, Needham "should be capable of simple & detailed work-like activity for full workday/work week." A.R. 69. She found his allegations about the severity of his condition to be "partially credible," enough to establish mild cognitive impairment but not enough to preclude all work-like activity. A.R. 70.

As for Needham's social interaction, Dr. Pollack found he was not significantly limited in interacting with the general public and getting along with peers, however, his ability to respond to criticism from supervisors was moderately limited. A.R. 71. As for Needham's adaptation, she found he was not significantly limited in traveling to unfamiliar places or using public transportation, not significantly limited in setting realistic goals and being aware of hazards, but moderately limited in responding to changes in the work setting. A.R. 71. Accordingly, Dr. Pollack concluded plaintiff had mild restriction in activities of daily living; moderate difficulties in social functioning; mild difficulties in concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. A.R. 69.

Dr. Pollack was a non-examining, state consultant physician, and the ALJ gave her opinion "most weight" because it was "consistent with the medical evidence of record. A.R. 21.

### 4. Dr. Preston Davis

On February 21, 2015, Dr. Davis, Psy.D. conducted a reconsideration of Dr. Pollack's consultative review. A.R. 99. He agreed with Dr. Pollack's assessments and found that evidence from, inter alia, Bayview and Pathways did not change the determination that Needham was not disabled. A.R. 88–92; see A.R. 94, 96, 99 ("The new MER [medical evidence of record] did not change the . . . determination"). He noted that although Needham's abilities to remember detailed information and carry out detailed instructions were moderately limited, Needham's abilities to concentrate for extended times and carry out simple instructions were not significantly limited. A.R. 113. Accordingly, Dr. Davis found mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. A.R. 110.

Dr. Pollack was a non-examining, state consultant psychologist, and the ALJ gave his opinion "most weight" because it was "consistent with the medical evidence of record." A.R. 21.

**DISCUSSION**

**A.     Standard of Review**

          This court has jurisdiction to review final decisions of the Commissioner pursuant

to 42 U.S.C. § 405(g).  See 42 U.S.C. § 405(c)(9) ("Decisions of the Commissioner of

Social Security under this subsection shall be reviewable by commencing a civil action in

the United States district court as provided in subsection (g).").  The ALJ's decision must

be affirmed if the ALJ's findings are "supported by substantial evidence and if the [ALJ]

applied the correct legal standards."  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th

Cir. 2001); see 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive").  "Substantial

evidence means more than a scintilla, but less than a preponderance."  Smolen v.

Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotation marks and citations

omitted); Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005);

Smolen, 80 F.3d at 1279.  If the evidence is subject to more than one rational

interpretation, the court must uphold the ALJ's findings if they are "supported by

inferences reasonably drawn from the record."  Tommasetti v. Astrue, 533 F.3d 1035,

1038 (9th Cir. 2008); see Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).  Yet the

reviewing court "must consider the entire record as a whole, weighing both the evidence

that supports and the evidence that detracts from the Commissioner's conclusion, and

may not affirm simply by isolating a specific quantum of supporting evidence."  Revels v.

Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).

          "The ALJ in a social security case has an independent duty to fully and fairly

develop the record and to assure that the claimant's interests are considered."  Id. at

1150 (internal quotation marks omitted).  Although the ALJ can and must weigh

conflicting evidence, "he cannot reach a conclusion first, and then attempt to justify it by

ignoring competent evidence in the record that suggests an opposite result."  Gallant v.

Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991). Harmless error is an error by the trier of fact which does not justify the reversal or modification of the lower court's ruling. See id.

**B.    Issues**

Needham seeks reversal of the ALJ's denial of Social Security disability benefits, arguing as follows:

1.    The ALJ improperly rejected opinions.

2.    The ALJ rejected plaintiff's testimony about his symptoms.

3.    The ALJ found plaintiff's bipolar disorder did not meet or equal a listing under Paragraph C.

4.    Because of the above errors, the ALJ omitted limitations in plaintiff's residual functional capacity.

5.    Because of the above errors, the ALJ relied on vocational expert testimony based on an incomplete hypothetical.

**C.    Analysis**

**1.    Whether the ALJ Erred in Evaluating the Medical Opinions**

Ninth Circuit case law and Social Security regulations distinguish between three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996); see also 20 C.F.R. §416.927. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id.

"To reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Revels, 874 F.3d at 654; accord See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017).

United States District Court
Northern District of California

1  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an

2  ALJ may only reject it by providing specific and legitimate reasons that are supported by

3  substantial evidence." Revels, 874 F.3d at 654; accord Lester, 81 F.3d at 830–31. "The

4  ALJ can meet this burden by setting out a detailed and thorough summary of the facts

5  and conflicting clinical evidence, stating his interpretation thereof, and making findings."

6  Revels, 874 F.3d at 654; see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595,

7  600–01 (9th Cir. 1999).

8      The ALJ may discount testimony from "other sources" if the ALJ "gives reasons

9  germane to each witness for doing so." Turner v. Comm'r of Soc. Sec., 613 F.3d 1217,

10  1224 (9th Cir. 2010) (quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)). Medical

11  sources not listed as an acceptable medical source are considered "other sources." See

12  20 C.F.R. § 416.913(d)(1) (2013). Licensed clinical social workers, therapists, public and

13  private social welfare agency personnel, and rehabilitation counselors are not acceptable

14  medical sources. SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006); see also 20 C.F.R.

15  § 416.913(d) (2013).

16      ### a.   Whether the ALJ Treated Records from Bay Area Community

17      ### Services (BACS) Therapists and Social Workers Erroneously

18      Plaintiff argues that the ALJ improperly rejected BACS "opinions and records"

19  without germane reasons supported by substantial evidence. Mot. at 9–12. Defendant

20  argues that the BACS observations do not constitute "medical opinions," and in fact they

21  do not include any opinions at all. Opp. 8–9. Plaintiff argues that, even though they are

22  not medical opinions, they are nevertheless opinions that require consideration under the

23  regulations and germane reasons to reject.[4]

24      "Opinions from medical sources who are not acceptable medical sources and from

25  nonmedical sources" will be considered "using the same factors as listed in paragraph

26

27  _____

28  [4] The parties correctly agree that the BACS records are not acceptable medical opinions.
    E.g., 20 C.F.R. § 416.913(d) (listing therapists among "other sources" who are not
    acceptable medical sources).

(c)(1) through (c)(6) in this section, [although] not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." 20 C.F.R. § 416.927(f). Those factors are: (1) whether the source of the opinion examined plaintiff; (2) whether the source of the opinion treated plaintiff for his impairments; (3) the supporting evidence and explanation the opinion provides; (4) how consistent an opinion is with the record as a whole; (5) whether the opinion is from a specialist about issues related to his or her area of specialty; and (6) other factors, for example the extent to which a medical source is familiar with the other information in plaintiff's case record. See 20 C.F.R. § 416.927(c)(1)–(6).

"The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." See 20 C.F.R. § 416.927(f)(2). To determine whether these requirements were met, the court asks whether the ALJ enunciated specific, germane reasons when rejecting a non-medical opinion. See, e.g., Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009); Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).

The BACS treatment record extends from September 2013 to July 2016. A.R. 904, 922. During that time, Needham received therapy and case management from BACS therapists, including Ms. Stuart and Ms. Guzman, and various social workers. A.R. 922, 944, 969, 1074. His symptoms included "overwhelming sadness" (A.R. 1039), suicidal ideation (A.R. 1045–46), anhedonia (A.R. 1039–44, 1047), hypersomnia (A.R. 1039, 1050), and fear of leaving the house (A.R. 1054). He was diagnosed with major depressive disorder (severe without psychotic features), alcohol dependence (partial remission), and amphetamine dependence (sustained remission). BACS assessed him with a GAF score of either 45 or 55 at the time of his admission in September 2013.

16

A.R. 904 (45), 907 (55).  Following that visit, BACS personnel consistently assessed him with a GAF score of 45.  A.R. 893–903; 910–1074.

The ALJ addressed the BACS records and their reported GAF figures directly.[5] He recounted that at the time of plaintiff's admission in September 2013, Dr. Maxwell observed that plaintiff was talkative and restless with dysphoric and expansive mood, ruminative thought content, and mildly impaired judgment.  Otherwise, he was normal, with a GAF score of 55.  A.R. 19.  From there, the ALJ explained that the records of his therapy with BACS, which continued through January 16, 2015, "consistently indicate a GAF score of 45," but that low score "is inconsistent with generally unremarkable observations" otherwise-present in the BACS record.  A.R. 19.  The ALJ rejected those low GAF scores because he found them to be inconsistent with the medical evidence of record and because they were assigned by social workers and family therapists who are not acceptable medical sources.  A.R. 19–20.  Additionally, BACS's services focused on transitional housing and access to community programs rather than plaintiff's mental health needs.  A.R. 20.  The ALJ also noted that the BACS notes "are generally unremarkable" and that they reported plaintiff's GAF to be "constant at 45 whether claimant was stable and euthymic or if he reported extreme depression following an amphetamine relapse," which shows the GAF scores were unreliable.  A.R. 20.  Finally, BACS observations in 2015 were "generally within normal limits."  A.R. 21.

Considering the above, the ALJ discounted the BACS's assessed GAF scores for germane reasons.  First, the ALJ may consider an opinion's own supplied supporting evidence and explanation (20 C.F.R. § 416.927(c)(3)), which the ALJ noted were repeatedly in tension with the assessed GAF figured.  E.g., A.R. 21 ("Observations during those visits are generally within normal limits (Exhibit 19F at 36-122).").  Second, and

---

[5] Although the GAF "does not have a direct correlation to the severity requirements in [the Commission's] mental disorders listings" (65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000); see McFarland v. Astrue, 288 Fed. App'x 357, 359 (9th Cir. 2008)), it is permissible for an ALJ to consider GAF level as evidence of a claimant's impairments (see Phillips v. Colvin, 61 F. Supp. 3d 925, 943 (N.D. Cal. 2014)).

1   relatedly, the ALJ discounted the BACS's assessed GAF score of 45 because, although

2   plaintiff's condition was changing substantially between visits, BACS's assessed score

3   never changed.  E.g., A.R. 20 (citing Exhibit 19F at 123-155, and noting that GAF score

4   did not change from when plaintiff "was stable and euthymic" to when he "reported

5   extreme depression following an amphetamine relapse").  Such inconsistencies across

6   time are relevant.  See Bagby v. Comm'r of Soc. Sec., 606 F. App'x 888, 889 (9th Cir.

7   2015) (substantial evidence supported the ALJ's reasons for discounting doctors' GAF

8   scores when they continued giving score of 40 despite significant improvement in

9   claimant's mental health).

10      Third, the ALJ explained that the BACS's assessed GAF score of 45 was

11   inconsistent with medical evidence in the record.  E.g., A.R. 19–21 (citing

12   contemporaneous medical evidence throughout the time period that BACS was

13   assessing a 45 GAF score showing that plaintiff in fact had higher levels of functioning).

14   The ALJ may consider how consistent an opinion is with the record as a whole.  20

15   C.F.R. § 416.927(c)(3)–(4).  Fourth, and relatedly, the ALJ afforded the BACS records

16   less weight than the conflicting medical evidence because BACS focused on housing and

17   related issues—not treating plaintiff—so that they were not acting as specialists when

18   assessing plaintiff's mental acuity.  The ALJ may consider whether the source of the

19   opinion treated plaintiff for his impairments and whether the opinion is from a specialist

20   about issues related to his or her area of specialty.

21      Plaintiff also argues that the ALJ impermissibly rejected the opinions in the BACS

22   records "that Plaintiff was depressed, anxious, and socially withdrawn, with a low

23   threshold for stress, low frustration tolerance, and periods of elevated mood as well as

24   periods when he could not get out of bed or complete basic tasks on his own."  Mot. at

25   10.  He further argues that "BACS records indicate Plaintiff's bipolar disorder causes

26   limitations related to social functioning, concentration, persistence and pace, adaptation,

27   the ability to tolerate routine stress, and maintain workplace attendance."  Mot. at 12.  On

28   reply, plaintiff identifies a number of symptoms that BACS opined were "interfering with

his" abilities. Reply at 3.

But the ALJ did not reject wholesale BACS's observations and assessments. Rather, he rejected the ultimate opinion of the GAF score, and in doing so he gave germane reasons, as explained above. Plaintiff argues that BACS opined that plaintiff's symptoms were "interfering" with his abilities to function, and the ALJ ignored those opinions. But the ALJ actually agreed with those observations. The ALJ made a determination at Step 2 that plaintiff does have severe impairments, and his RFC determination was based on those impairments. Those findings are consistent with the BACS records plaintiff cites.

### b. Whether the ALJ Erroneously Accorded Dr. Abraham and Dr. Reed's Opinions Improper Weight

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Abraham and Dr. Reed by omitting "moderate" limitations they identified from the RFC determination. Defendant argues that an ALJ can adequately capture moderate mental limitations by accepting a medical source's translation of those limitations into a restriction to simple or unskilled work.[6]

As a general rule, "[t]he ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). For example, in Stubbs-Danielson, the Ninth Circuit ruled that the ALJ's RFC finding limiting the claimant to simple tasks "properly incorporated the limitations identified by" the medical doctors, "including those related to pace and the other mental limitations regarding attention, concentration, and adaption." Stubbs-Danielson, 539 F.3d at 1174. Courts have widely applied that principle. See Williams v. Colvin, 609 F. App'x 495, 496 (9th Cir. 2015) ("The RFC

---

[6] Because the court finds that the ALJ adequately captured moderate mental limitations by accepting a medical source's translation of those limitations into a restriction to simple or unskilled work, the court does not address defendant's alternative argument that an RFC finding need not incorporate moderate mental limitations at all.

finding adequately incorporated limitations related to concentration, persistence, or pace because it limited the work that Claimant could do to simple, repetitive tasks.") (citing Stubbs-Danielson, 539 F.3d at 1176); Elmore v. Colvin, 617 F. App'x 755, 758 (9th Cir. 2015) ("the ALJ did not err by translating pace and mental limitations, into the only concrete restrictions available to him—a recommended restriction to 'simple tasks.'") (quoting Stubbs-Danielson, 539 F.3d at 1174); see also Mitchell v. Colvin, 642 F. App'x 731, 732–33 (9th Cir. 2016); Bruesch v. Colvin, 609 F. App'x 481, 481–82 (9th Cir. 2015) ("In Stubbs–Danielson, we held that a finding that a claimant had the residual functional capacity 'to perform simple, routine, repetitive sedentary work,' as well as a hypothetical question that reflected the same limitations, adequately incorporated limitations related to pace and other mental limitations regarding attention, concentration, and adaption that had been identified by doctors.").

On February 14, 2014, upon examining Needham, Dr. Abraham concluded Needham had mild impairments in understanding information and sustaining effort, as well as no significant impairment in social interaction. A.R. 516, 528–29. She also opined that Needham had a moderate limitation in adaptation because he would have "difficulty coping with [the] daily or [] usual stresses encountered in a competitive work environment" and that his "mood changes [would] interfere with his ability to sustain effort or adapt to changes in tasks or responsibilities." A.R. 529.

On July 30, 2014, Dr. Pollack reviewed Dr. Abraham's evaluation and other records to determine that claimant "should be capable of simple [and] detailed work-like activity for full workday/work week." A.R. 69.

On December 15, 2014, Dr. Reed started treating Needham and assessed that he had moderate restrictions in activities of daily living; moderate difficulties in social functioning; mild difficulties in maintaining, concentrating, and persistence of pace; and moderate episodes of decomposition and increase of symptoms. A.R. 535. State consultant Dr. Davis reviewed Dr. Abraham's evaluation, Dr. Reed's assessments (see A.R. 104–06), and other records to reach the same determination as Dr. Pollack—

1    Needham's ability to complete a normal workday and workweek would not be significantly

2    limited.  A.R. 99.

3         For the Step Three Listing determination, the ALJ assigned the "most weight" to

4    the opinions of Dr. Pollack and Dr. Davis and "great weight" to the opinions of Dr.

5    Abraham and Dr. Reed.  A.R. 21–22.  For the RFC finding, the ALJ assigned "great

6    weight" to all four opinions.  A.R. 24–25.  His reasoning for each of these decisions was

7    that the opinions were "consistent with the medical evidence of record, discussed above."

8    A.R. 22.

9         Dr. Pollack and Dr. Davis translated limitations on Needham's concentration,

10   social functioning, and activities of daily living into a restriction to simple work.  This is

11   permitted.  See, e.g., Stubbs-Danielson, 539 F.3d at 1174 (ALJ properly relied on state

12   agency physician's translation of claimant's moderate mental limitations, which were

13   observed by an examining doctor, into a restriction to "simple" work).  Contrary to

14   plaintiff's argument that Stubbs-Danielson is factually distinguishable because the

15   translation only pertained to pace limitations (Reply at 4), Stubbs-Danielson's reasoning

16   extended to "other mental limitations regarding attention, concentration, and adaption"

17   (Stubbs-Danielson, 539 F.3d at 1174).  This principle applies equally to moderate

18   limitations in social functioning, attendance, and ability to do work without special

19   supervision—which are relevant to this case.  See Hurley v. Astrue, Case No. 12-cv-

20   01993-EDL, 2013 WL 12125536, at *6 (N.D. Cal. Apr. 15, 2013) (attendance and

21   supervision); Allain v. Astrue, Case No. 09-cv-00810-MLG, 2009 WL 3514424, at *3

22   (C.D. Cal. Oct. 27, 2009) (social functioning).

23        Because the opinions of Dr. Abraham and Dr. Reed are consistent with those of

24   Dr. Davis and Dr. Pollack, the ALJ has not implicitly rejected the former two and did not

25   impermissibly elevate the latter two.  At Step Three, the ALJ rated Needham's degree of

26   functional limitations in four areas and "was not required to make any more specific

27   findings."  Hoopai v. Astrue, 499 F.3d 1071, 1078 (9th Cir. 2007).

28   **2.     Whether the ALJ Erroneously Accorded Needham's Testimony Improper**

**Weight.**

Plaintiff argues that the ALJ erroneously rejected his statements about the severity of his mental condition, thereby leading to an erroneous Step Three determination and RFC determination.

An ALJ engages in a two-part analysis to determine whether a claimant's testimony regarding subjective symptoms is credible.

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007)). The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, so this step is satisfied. A.R. 24. Neither party challenges that determination.

Second, if the claimant satisfies the first part and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." Garrison, 759 F.3d at 1014; see also Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."); Morgan, 169 F.3d at 599 (the ALJ "must provide 'specific, cogent reasons for the disbelief'"). In making credibility determinations, the ALJ must specifically identify the testimony she finds not to be credible and must explain what evidence undermines the testimony. See Holohan, 246 F.3d at 1208. When weighing the claimant's credibility, the ALJ may consider factors such as the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." Thomas v. Barnhart, 278 F.3d

947, 958–59 (9th Cir. 2002) (internal quotation marks omitted).

At the second step, the ALJ found that petitioner's testimony concerning the intensity, persistence, and limiting effects of his impairments was not entirely credible because (a) Needham's testimony about why he quit working as a truck driver was inconsistent with the record; and (b) Needham's account of his limitations was inconsistent with the medical evidence of record. A.R. 24.

### a. Loss of Driver's License

The parties dispute whether the ALJ permissibly discounted plaintiff's testimony at the hearing because of allegedly-inconsistent reports about why he stopped working as a truck driver.

To determine whether the claimant's testimony regarding the severity of his symptoms is credible, "the ALJ may consider . . . ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid[.]" Smolen, 80 F.3d at 1284.

The ALJ found two of claimant's statements to be inconsistent with the record. A.R. 24.

First, the ALJ found that plaintiff's testimony about why he lost his truck-driving job was inconsistent with the record:

> Claimant alleges he quit working as a truck driver in 2004 because of his conditions (Testimony and Exhibit 3E at 3). However . . . the current medical evidence of record shows claimant was "previously employed as commercial truck driver, but lost his license/job after crashing into a pole and received a DUI," (Exhibit 11F at 42 and 43). . . . Claimant testified he does not have a driver's license because his mental conditions make him unsafe. As discussed above, the medical evidence of record shows claimant lost his job after an alcohol-involved crash in 2004. A July 9, 2015 record from Catherine Reed, M.D., indicates he was also in DUI classes at that time (Exhibit 17F at 23). Thus, claimant's allegations of disabling mental impairment are inconsistent with the medical evidence of record[.]

A.R. 24.

United States District Court
Northern District of California

The record is not entirely clear on this point, and plaintiff's own testimony contributed to the ambiguity. Given the importance of live testimony and credibility determinations to resolving this issue, the court does not find that the ALJ committed reversible error by discounting plaintiff's testimony at the hearing to some degree because his testimony was inconsistent with the record with respect to why he no longer had a license and stopped working as a truck driver.

Upon review of the record as a whole, the following timeline appears most plausible with respect to Needham's driving and work history, although it contains inconsistencies and leaves room for clarification:

- From approximately 1988 or 1996 to 2004, plaintiff worked as a truck driver. A.R. 519 (1996–2001); A.R. 270 (1988–2004).

- In 2000 or 2001, plaintiff was assaulted while on the job, driving his delivery truck. A.R. 518–19.

- Following the 2001 assault, he stopped driving the truck and received some compensation based on his disability. A.R. 519 (received "disability through work" for about two years); A.R. 250–52 (no FICA earning after at least 2006, potentially earlier).

- In January 2004, he stopped working his job as a truck driver "because of [his] conditions." A.R. 270 (truck driver position ended in 2004); A.R. 250–52 (no FICA earning after at least 2006, potentially earlier).

- Sometime during 2010–2013, for "a few months," plaintiff had and lost a part-time "job in construction." See A.R. 40–41 (May 2017 testimony); A.R. 582 (September 2013 report discussing loss of construction job); A.R. 913 (2016 report stating that "construction was under the table").

- A September 2013 report states that plaintiff was "Previously employed as commercial truck driver, but lost his license/job after crashing into a pole and received DUI." A.R. 582–83. This report is vague and difficult to reconcile with the record as a whole.

24

- Around 2006, he divorced. A.R. 770.

- Somewhere between 2007 and 2010, he was charged with DUI. A.R. 50 (Needham testifying that he got the DUI "about a year" after the divorce [2007]), 534 (December 2014 report stating DUI was about 6 years ago [2008]), 770 (December 13, 2013 evaluation stating DUI happened "3 yrs. ago" [2010]), 520 (March 2014 report stating DUI charged "[a]pproximately six years ago" [2008]).

- September 2013 is plaintiff's alleged onset date of disability.

- In 2016, plaintiff completed classes to earn back his license following the DUI, after struggling to do so. A.R. 913 (completed classes in 8/2016), 534 (intent to complete classes as of 12/2014), 980 (intent to continue DUI classes as of 8/2015).

- In May 2017, plaintiff testified before the ALJ. He stated that he was a commercial truck driver within the past 15 years. He also stated that he did "some demolition work" four, five, six, or seven years ago, which would place that around 2010–2013. He did that part-time for a few months. A.R. 40–41. He also testified that he does not currently have a driver's license because "I'm not safe. I wouldn't put the -- when I drove professionally I considered it I was a professional and I'm not -- I couldn't imagine putting other peoples' lives in danger by having me on the road." A.R. 49. Lives would be in danger because plaintiff can't think or focus on the road sufficiently. Plaintiff also stated "I've never been in an accident, I've never had a ticket while driving professionally and I can't give that. I can't even give 30 percent of my attention." A.R. 49. He was later asked if he ever had a DUI, and he answered "I had a DUI after the divorce. I think it was about a year after. . . . I got a baby sitter and I went out and I was just angry and stupid and I got -- drank more than I've ever done in my entire life." A.R. 50.

25

It appears that plaintiff drove a delivery truck until 2001 when he was assaulted, and following the assault he collected disability insurance until about 2004. He then got divorced, had some off-the-books work in light construction/demolition, and was charged with a DUI while driving for personal reasons, not associated with any employment. The record generally supports a timeline wherein the DUI came some time after plaintiff lost his truck-driving job. One piece of evidence in the record suggests otherwise, but that record is not particularly reliable on this point. A.R. 582–83. That record is a medical evaluation report based on an interview with plaintiff, and the reference to the DUI is included near the end of a lengthy comment section that is primarily concerned with plaintiff's mental health. The notes discuss whether plaintiff was hopeful about the future, which is when it noted that he was "[p]reviously employed as commercial truck driver, but lost his license/job after crashing into a pole and received DUI." A.R. 582–83. As relevant to his mental health, the record is accurate enough because plaintiff could not look forward to getting his driving job back because of the DUI—regardless of the circumstances under which he lost his license. On remand, the ALJ has opportunity to clarify the record on this point and reevaluate the reliability of claimant's testimony.

Second, the ALJ found plaintiff's statement about why he does not have a driver's license inconsistent with the record. The ALJ stated that "Claimant testified he does not have a driver's license because his mental conditions make him unsafe. As discussed above, the medical evidence of record shows claimant lost his job after an alcohol-involved crash in 2004" and that "he was also in DUI classes." A.R. 24.

At the hearing, plaintiff was asked "You said you don't have a driver's license. Why not?" to which he answered that he loves driving but does not feel safe driving because he cannot sufficiently concentrate. A.R. 49. He later testified that he had completed all of his DUI course requirements and could get his driver's license back if he passed the test. A.R. 50.

When assessing credibility, the ALJ may consider ordinary techniques of credibility evaluation, including "testimony by the claimant that appears less than candid[.]"

Smolen, 80 F.3d at 1284. Here, it is clear that plaintiff lost his driver's license because of his DUI offense. Although the record also suggests that by the time of his testimony he had completed certain mandatory courses that were necessary (but not sufficient) steps to regaining his license, the most acute cause of his lost license was his DUI. Yet, in response to the question "you don't have a diver's license. Why not?", plaintiff neglected to mention his DUI at all, but rather testified that he did not feel safe driving. Although plaintiff may have meant that he had not gone to take his driver's license test because he feels unsafe to drive—even though he would be permitted to take the test because he finished his DUI classes—this is precisely the type of issue where deference to the ALJ's evaluation of live testimony is appropriate. Such less-than-candid testimony is a permissible and specific reason for the ALJ to discount the credibility of plaintiff's testimony. Moreover, the harm to plaintiff's credibility was not cured by a later discussion about the DUI, raised only after he was specifically asked about it by counsel. A.R. 50.

### b.    Medical Record and Severity of Symptoms

Plaintiff argues that the ALJ did not cite to much of the record in the section of the disposition discounting plaintiff's testimony about his subjective symptoms, and that it is improper to "isolate[] examples of improvement in the record" to reject his testimony. Reply at 6. Defendant argues that the ALJ properly found that plaintiff's allegations about his inability to work were not supported by the medical record and treatment history, and the ALJ cited relevant portions of the record elsewhere in the decision. Opp. 3–4.

With respect to "mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison, 759 F.3d at 1017. Instead, reports of improvement "must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." Id.

The ALJ considered plaintiff's testimony that he is unable to work due to his depression, which keeps him from getting up, showering, and brushing his teeth. A.R. 41–42. The testimony included allegations that Needham could not function during manic phases lasting a week, that his depressions lasted up to three months, that he heard voices preventing him from sleeping and concentrating, and that "doing really good" meant "getting a good week or two out of a couple months." Id. The ALJ concluded that Needham's allegations of his inability to work were inconsistent with the "medical evidence of record," specifically pointing to five pieces of evidence:

1. On April 27, 2016, Needham reported he was not bothered by his auditory hallucinations and is able to ignore them. A.R. 871.

2. Needham testified that he goes to five or six meetings per week at his transitional housing facility.

3. Needham testified that he gets along well with his housemates.

4. Needham testified in May 2017 that he was depressed the last three months. Yet, he received a GAF score of 60 and said that he was "doing well" on medications on September 29, 2016 (A.R. 1077), and in April 2017 records indicate that he felt stable on medications (A.R. 1084).

5. Needham testified that his medications are helpful in managing his symptoms, "especially his newly prescribed Latuda." A.R. 24. Yet, he has been on Latuda since December 15, 2014. A.R. 864, 867.

6. Needham's GAF scores ranged from 55 to 70 since he was "stabilized in September 2013." A.R. 24.

First, regarding the auditory hallucinations, the record is replete with references to them and how they bother plaintiff. Here, the ALJ identified a single record diminishing their severity. The ALJ summarized the record by writing that "he is not bothered by his auditory hallucinations, which he is able to ignore." A.R. 24. But even the particular record cited to is more nuanced. It states that "AH [auditory hallucinations] have decreased, pt [patient] is able to ignore, not bothered by them." A.R. 871. Rather than

28

show that his auditory hallucinations never pose a problem, that record evidences that plaintiff experiences cycles of improvement with respect to his auditory hallucinations. At that particular time, they "ha[d] decreased." That is consistent with his testimony. Plaintiff testified that for a few weeks out of every couple of months he "can think halfway decent and the voices aren't so loud and so persistent. It's easier to block them out, to ignore them. . . . To make them softer in my head. . . . It's hard to explain." A.R. 42. A single examination occurring during a time when the hallucinations had decreased is not sufficiently-attuned to "the patient's overall well-being and the nature of her symptoms" to justify discounting plaintiff's testimony. <u>Garrison</u>, 759 F.3d at 1017.

Second, neither party addressed Needham's testimony that he regularly attends meetings at his transitional housing facility, and the ALJ did not provide a citation supporting that statement. As with Needham's auditory hallucinations, his testimony is more nuanced than the ALJ's analysis suggests. Plaintiff testified that when he is "in the pit," he sleeps all the time. But "[t]hese past weeks I've been fighting everything really strong. I go to -- thank God the building I live in has services and I go to at least five or six meetings a week now to -- you know, to get me out of there, out of the room. They know I'm bad at it, so they have my number, so they call me to remind me, because I forget. You know? They call to remind me to tell me to come downstairs. Just, you know -- I just have to walk down five stairs[.]" A.R. 44. In context of his full answer, plaintiff appears to be describing a recent phase where he has come out of "the pit" and was putting forth a large effort to attend meetings. Even then, he often forgot and was regularly reminded to attend, even though the meetings took place steps away, in the same building in which he lived. As with Needham's auditory hallucinations, the ALJ identified isolated evidence of a short and recent positive cycle in plaintiff's abilities—not an overall trend supported by the record. Moreover, the supporting testimony makes clear that plaintiff requires assistance to attend even the meetings he does not miss.

Third, Needham testified that he gets along well with his housemates. This is supported by the record (A.R. 44–45), although it is unclear and unexplained by

defendant how this fact undermines plaintiff's other testimony or his credibility.

Fourth, the ALJ points out that plaintiff testified in May 2017 that he had recently been depressed, yet records indicate that he was "doing well" on September 29, 2016 and was stable in April 2017. At the hearing, plaintiff testified that he "just got out of a three month" depressive phase "just a few weeks ago." A.R. 42, 44 (plaintiff has been "fighting everything really strong" "these past weeks"). So, plaintiff testified on May 19, 2017 that he got out of a three-month depressive pit "a few weeks ago." Although imprecise, that would allow the depression to have subsided somewhere between mid-April and early May. Accordingly, the three-month depressive episode could have started around mid-January to early February 2017, and ended around mid-April or early May 2017. Of course, these dates are approximate.

The ALJ points out that the record reflects plaintiff was doing well, "feels stable," and was "very pleasant" on April 27, 2017. A.R. 1084, 1086. There is no indication of an ongoing depressive episode at that time. Given that the exam at issue happened in late April (only 22 days before the hearing before the ALJ), plaintiff's testimony that his recent, 3-month depressive spell ended a "few weeks" ago is potentially consistent with the record. At least, the report does not clearly and convincingly contradict plaintiff's testimony. For example, it would be consistent with plaintiff's testimony and the medical records cited by the ALJ (from September 2016 and April 2017) if plaintiff had been in a 3-month depressive episode sometime between November 2016 and mid-April 2017.

Fifth, the ALJ noted that plaintiff testified at the hearing that his medications are helpful in managing his symptoms, including "[t]he newest one they just got me on, Latuda." A.R. 47; see also A.R. 24. The ALJ also pointed out that plaintiff had been on Latuda since December 15, 2014. A.R. 864, 867. Yet, the ALJ did not explain why he considered these points relevant. For example, the ALJ did not explain whether the discrepancy in timeline suggested that plaintiff's testimony was generally unreliable, whether the testimony substantively suggested that plaintiff was now stable on his current medications and dosages, or whether there was still some other reason the testimony

30

1    was relevant or unreliable.  Absent some explanation, there is no specific, clear, and

2    convincing reason to reject plaintiff's testimony about the severity of his symptoms based

3    on this point.

4         Sixth, the ALJ generally references, without citation, GAF scores assessed

5    beginning in September 2013 that range from 55 to 70.  Although GAF scores can

6    provide useful information, general references to GAF scores over a long period, without

7    identification of particular assessments, are not sufficiently-specific to provide clear and

8    convincing evidence to discount plaintiff's testimony.

9         Defendant's briefing raises additional record evidence, uncited by the ALJ, to

10   support a finding that the medical record is inconsistent with plaintiff's testimony.  But the

11   ALJ must specifically identify the testimony he finds not to be credible and must explain

12   what evidence undermines that testimony.  <u>Holohan</u>, 246 F.3d at 1208.  It is not enough

13   that evidence exists in the record that the ALJ could have cited when making his

14   credibility determination.  <u>See</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007) ("We

15   review only the reasons provided by the ALJ in the disability determination and may not

16   affirm the ALJ on a ground upon which he did not rely.").

17   **3.    Listing Determination**

18        If a claimant establishes that his impairments meet or medically equal an

19   impairment listed in 20 C.F.R. part 404, subpart P, appendix 1, an ALJ will find that the

20   impairments are severe enough to prevent the performance of any gainful activity.  <u>See</u>

21   20 C.F.R. §§ 404.1525(a), 416,925(a), 404.1526, 416.926.

22        The ALJ must show that he or she has evaluated the relevant evidence before

23   deciding whether the claimant meets or equals a listed impairment.  <u>Lewis</u>, 236 F.3d at

24   512–13 ("A boilerplate finding is insufficient to support a conclusion that a claimant's

25   impairment does not" meet or equal a listed impairment.).  As relevant here, listing 12.04

26   can be satisfied by meeting the requirements of Paragraph A and either Paragraph B

27   or C.  The court addresses each in turn.

28        **a.    Paragraph A**

First, plaintiff argues that the ALJ failed to address Paragraph A, even though "the [r]ecords show [Needham] has five or more symptoms" meeting its requirements.  Mot. at 20 n.4.  Defendant argues that plaintiff's argument is waived because generally referencing a 6-page statement of facts does not adequately brief the argument.  Opp. at 12.

The court need not reach this issue because the ALJ's failure to mention Paragraph A in the listing determination does not necessarily constitute legal error.  The ALJ appears to have assumed without deciding that Paragraph A was met, and moved on to Paragraphs B and C, which he determined were not met.  See Walters v. Colvin, No. 14-cv-03147-RHW, 2016 WL 8233438, at *5 (E.D. Wash. June 15, 2016) (ALJ did not commit error when finding that claimant did not meet Listing 12.04 despite not discussing Paragraph A because substantial evidence showed that claimant did not meet the Paragraph B and Paragraph C criteria).

### b.    Paragraph B

Neither party challenges the ALJ's Paragraph B finding.

### c.    Paragraph C

To meet the Paragraph C requirements, claimant's mental disorder must be "serious and persistent."  Serious and persistent means that there is a medically documented history of the existence of the mental disorder over a period of at least 2 years, and evidence shows both:  (1) claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) to diminish the symptoms and signs of the mental disorder; and (2) despite claimant's diminished symptoms and signs, he has achieved only marginal adjustment. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  "Marginal adjustment" means that claimant's adaptation to the requirements of daily life is fragile; that is, he has minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  Id.  The marginal adjustment requirement is satisfied, for example, when changes or increased demands have led to exacerbation of claimant's symptoms and signs and to

deterioration in functioning.  Id.

To make his listing determination, the ALJ first considered Paragraph B and summarized the mental health treatments records from 2013 to 2017.  After concluding that Paragraph B was not satisfied, the ALJ summarily wrote that "the evidence fails to establish the presence of the 'paragraph C' criteria," and then listed the formal disjunctive and conjunctive requirements of Paragraph C.  A.R. 19–23.  Plaintiff characterizes this analysis as impermissible "boilerplate recitation."  Mot. at 20.

An ALJ can evaluate the medical record in a separate section before concluding whether a petitioner meets the Paragraph C requirements.  Lewis, 236 F.3d at 513 (the law "requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading 'Findings'"); see also Holguin v. Berryhill, Case No. 16-cv-06479-HRL, 2017 WL 3033672, at *4 (N.D. Cal. July 18, 2017) (discussion of medical evidence in other sections is sufficient).

In this case, the ALJ discussed Needham's medical records at length when considering Paragraph B, immediately before concluding that he did not meet the Paragraph C requirements.  See A.R. 19–23.  Contrary to plaintiff's argument, the ALJ's reasoning concerning Paragraph B is appropriate for this court to assess when determining whether the ALJ adequately supported his conclusion that plaintiff did not satisfy Paragraph C.  That said, although technically allowed, review of the ALJ's Paragraph C assessment is made difficult because the decision states all of Paragraph C's requirements in a single sentence, and simply concludes that plaintiff did not satisfy Paragraph C.  The ALJ has not explained which requirement or requirements of Paragraph C were not met.

The court is left to guess, for example, whether the ALJ's decision turned on whether or not plaintiff had a medical disorder for two years.  Equally, the decision may have turned on the ALJ's conclusion that there was insufficient evidence of ongoing treatment or a structured setting that diminishes symptoms of plaintiff's mental disorder. The ALJ's decision might also have turned on his assessment as to whether there is

evidence of marginal adjustment, meaning a minimal capacity to adapt to new demands or changes in the environment.

Without identifying the basis for his decision—which, if provided, this court could evaluate in light of earlier-assessed evidence—the ALJ has not made "sufficient findings upon which a 'reviewing court may know the basis for the decision.'" Jessica B. v. Comm'r of Soc. Sec., Case No. 18-cv-3074-TOR, 2019 WL 850954, at *5 (E.D. Wash. Jan. 30, 2019) (quoting Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990)). As such, "the Court simply cannot determine from the ALJ's opinion how he came to the conclusion that Plaintiff's 'severe' impairments did not meet or equal the Paragraph C criteria under the listings." Id.[7]

### 4.  Whether RFC Finding Is Supported by Substantial Evidence

Plaintiff argues that the ALJ's RFC determination is flawed based on the arguments addressed above. Given the above discussion, on remand, the ALJ must reassess the weight he assigns to plaintiff's testimony, and he must reassess whether plaintiff meets the Paragraph C requirements. Those assessments will inform the ALJ's RFC determination on remand. Needham articulates no other potential source of error with respect to this finding.

### 5.  Whether ALJ Erred by Relying on Vocation Expert Testimony Based on an Incomplete Hypothetical

The ALJ may ask a vocational expert a question about a hypothetical claimant with an RFC that reflects all of the claimant's limitations supported by the record, but the hypothetical loses evidentiary value if it omits limitations.

Plaintiff argues that the ALJ omitted limitations based on the arguments addressed above. This argument is duplicative of the argument that the RFC finding is not

---

[7] Defendant argues that the ALJ's Paragraph C determination is required because plaintiff has not been hospitalized since September 2013. But hospitalization is not a requirement to satisfy Paragraph C. The regulation refers—as an example—to situations where episodes of deterioration require hospitalization or absence from work, but those are examples, not requirements. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

34

1 supported by substantial evidence. For the same reasons discussed above, on remand,

2 the ALJ must reassess the weight he assigns to plaintiff's testimony, and he must

3 reassess whether plaintiff meets the Paragraph C requirements. Those assessments will

4 inform the ALJ's RFC determination on remand, which will in turn inform the evidentiary

5 weight appropriate to afford the hypothetical question posed to the vocational expert.

6 Needham articulates no other potential source of error with respect to this finding.

7 **6.     Whether Remand Is the Proper Disposition**

8      "Remand for further administrative proceedings is appropriate if enhancement of

9 the record would be useful." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)

10 (citing Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)). Under Harman, the court

11 may credit evidence that was rejected by the ALJ and remand for an award of benefits "if

12 (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there

13 are no outstanding issues that must be resolved before a determination of disability can

14 be made; and (3) it is clear from the record that the ALJ would be required to find the

15 claimant disabled were such evidence credited." Benecke, 379 F.3d at 593 (citing

16 Harman, 211 F.3d at 1178).

17      With respect to the first Harman factor, the ALJ failed to provide legally sufficient

18 reasons for discounting plaintiff's testimony regarding the severity of his symptoms.

19 Second, there are outstanding issues that must be resolved before a determination of

20 disability can be made. Specifically, the ALJ must determine how to weigh plaintiff's

21 testimony, and whether plaintiff meets the Paragraph C requirements. Third, it is not

22 clear from the record that the ALJ would be required to find the claimant disabled even if

23 the evidence were credited.

24      It is appropriate here to follow the "ordinary remand rule" and not apply the "rare"

25 remedy of finding disability when the agency did not. See Treichler v. Comm'r of Soc.

26 Sec. Admin., 775 F.3d 1090 (9th Cir. 2014).

27                                   **CONCLUSION**

28      For the foregoing reasons, Needham's motion for summary judgment is

United States District Court
Northern District of California

GRANTED. The Commissioner's cross-motion for summary judgment is DENIED. The ALJ's decision to deny Needham's disability benefits failed to adequately explain how he weighed Needham's testimony regarding the severity of his symptoms, and he failed to adequately explain whether plaintiff meets the Paragraph C requirements. Thus, remand is appropriate pursuant to 42 U.S.C. § 405(g). On remand, the ALJ should explain the weight he accords plaintiff's testimony, and his reasons for doing so. The ALJ should also explain whether plaintiff meets the Paragraph C requirements, including in light of whatever weight he accords plaintiff's testimony. The ALJ's consideration of these issues on remand may or may not impact his RFC determination and the relevance of the hypothetical question posed to the vocational expert.

This order fully adjudicates the motions listed at Nos. 18 and 19 of the clerk's docket for this case, closes the case, and terminates all pending motions.

**IT IS SO ORDERED.**

Dated: October 31, 2019

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge